Filed 9/12/22  In re I.F. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re I.F., a Person Coming Under the Juvenile Court Law. | |
| SONOMA COUNTY HUMAN SERVICES DEPARTMENT,<br><br>    Plaintiff and Respondent,<br><br>                    v.<br><br>J.F.,<br><br>    Defendant and Appellant. | A163519<br><br>(Sonoma County<br>Super. Ct. No. DEP-4156-02) |

J.F. (Father) appeals an order terminating his parental rights to now 10-year-old I.F. (Minor) at a permanency planning hearing (Welf. & Inst. Code, § 366.26).[1]  Section 366.26 provides that, if the juvenile court determines a child is likely to be adopted and reunification services were previously terminated, the court must terminate parental rights to allow for adoption unless certain statutory exceptions apply.  (*Id.*, subd. (c)(1).)  One such exception is the "parental-benefit" exception, applicable where the parent has regularly visited with the child, the child would benefit from continuing the relationship, and termination of parental rights would be

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

detrimental to the child. (*Id.*, subd. (C)(1)(B)(i); *In re Caden C.* (2021) 11 Cal.5th 614, 629 (*Caden C.*).)

In this appeal, Father argues that the juvenile court abused its discretion in determining that the parental-benefit exception did not apply here. We disagree and affirm.

## BACKGROUND

### A. *Petition*

In May 2019, the Sonoma County Human Services Department (the department) filed a section 300 petition alleging Minor was suffering, or at substantial risk of suffering, serious emotional damage due to ongoing emotional abuse from her mother, and that the abuse manifested in "chronic depression, aggressive outbursts, self-harming and suicidal ideation, chronic hopelessness, anxiety and a desire to be placed in out of home care, as a result of the mother being unceasingly rageful, verbally abusive, threatening and punishing towards the child." (§ 300, subd. (c).) It further alleged that Father's whereabouts were unknown at that time. (*Ibid.*) Minor and her two half-sisters (now 13 and 19 years old) had been the subject of multiple prior referrals, and the department had provided services to the family since 2012. During a forensic interview in 2018, Minor's half-sister L.Q. disclosed two instances of oral copulation by Father (L.Q.'s stepfather) and other times when Father would touch her chest over her clothing.[2]

_____

[2] The record reflects that Father was arrested on "charges with sex acts with a minor under the age of ten and lewd or lascivious acts with a child under fourteen years," but that the charges were later dismissed. According to the department, the sexual abuse allegation was "substantiated by the department after a thorough investigation" and also resulted in a civil restraining order against Father that protects Minor's mother and half-sisters, and is in effect until 2024.

**B.** *Detention and Jurisdiction/Disposition*

At the May 2019 detention hearing, the juvenile court found a prima facie case had been made that Minor and her two half-sisters came within section 300, and that there were no reasonable means to protect their health absent removal. It ordered the children detained. The department subsequently filed an amended petition removing the section 300, subdivision (g) allegation because Father had responded to search letters and provided his updated contact information. At that time, Minor's mother reported that she had not spoken to Father since July 2018, and he had "not made any effort to be a father to [Minor]." Father reported that he had the closest relationship with L.Q., and did not have "bonding experience" with Minor because the children had been previously removed from his and the mother's care when Minor was six months old. At the July 2019 jurisdictional/dispositional hearing, the court declared Minor a dependent of the court and ordered reunification services.

**C.** *Review Hearings*

At the January 2020 six-month review hearing, the department recommended continuation of reunification services for both parents. The social worker expressed concern that Minor had exhibited "sometimes-feral behaviors," but was making progress with social interactions. Father had weekly supervised visits with Minor. The social worker, however, reported that Father missed two appointments with her and expressed "concern with regards to his commitment to services." Father was working at a winery, living with his partner and twins he had fathered, and helping to manage the compromised health of one of his twins. The social worker also stated that Father's "inability to acknowledge the abuse [disclosed by L.Q.] and to mitigate the safety concerns regarding his relationship to [Minor] have challenged the probability of reunification."

3

At the July 2020 12-month review hearing, the department again recommended continuation of reunification services for both parents. A social worker reported that Minor's "feral behaviors" had decreased and her communication skills had improved, but that Minor struggled to complete her schoolwork. Due to COVID-19, Father had video calls with Minor twice a week.

In advance of the January 2021 18-month review hearing, the department recommended terminating reunification services and setting a section 366.26 hearing. In the months before this hearing, Minor's behaviors had regressed and she was "unable to carryout typical age activities that include the following: regular bathing, adhering to house norms/rules, and occasional tantrums have become daily." Minor was still struggling with her schoolwork. Shortly before the hearing, Minor was placed in Southern California with her maternal aunt; her half-sisters were also living nearby with another relative. The social worker reported that Minor was no longer experiencing regular tantrums or struggling with hygiene. The social worker maintained that Father's "refusal to acknowledge the abuse [of L.Q.] and to mitigate the safety concerns regarding his relationship to [Minor] has created a significant barrier to reunification."

At the hearing, counsel for Father stated that he was submitting to the termination of services because he and the social worker were "at a very tough impasse for successful reunification." Counsel continued, "So he is taking the step forward and submitting on ending services, but he wants the court to know he's doing all his visits and really appreciates all the time he can get with [Minor]." Mother testified at the hearing that she believed L.Q. was sexually assaulted by Father. The court adopted the department's

recommended findings and orders, terminating reunification services and scheduling a section 366.26 hearing.

### D. *Section 366.26 Hearing*

Four months before the section 366.26 hearing, Minor was moved from her maternal aunt's home to live with a prospective adoptive parent (A.P.)—a friend of the aunt who wanted to adopt Minor and lived only a few minutes away from Minor's half-sisters. The social worker reported that Minor's behavioral concerns had "drastically improved," and that she was "thriving from the 1:1 attention that she is currently receiving." Minor had expressed how much she enjoyed living with A.P. and that she would like to move forward with adoption. A.P. was supportive of Minor's educational challenges, and had enrolled Minor in swimming lessons and a basketball league. Father had video calls with Minor once a week. The department recommended that parental rights be terminated in order to pursue adoption. It stated that the incidental benefit of interaction between Minor and her parents was outweighed by the benefit of adoption, and that termination of parental rights would not be detrimental to Minor.

Both parents contested the department's recommendation. At the August 2021 hearing, social worker A.W. testified that Minor had adjusted very well to her placement with A.P. and wanted to stay. Minor had spent time with both of her half-sisters, and A.P. was committed to continuing to foster those relationships.

The social worker testified that Minor was placed with A.P. because the maternal aunt (who has four biological children of her own) felt unable to give Minor the one-on-one attention that she needed. Minor was thriving in her placement with A.P., being the only child in the home and having the "most stability" she had ever had. The social worker testified that A.P. was

"more than open to allowing post-adoption contact with the biological parents as long as it's safe and it meets [Minor's] needs."

Father testified that the visitation schedule had made it harder for him to "get close" to Minor. He observed that when Minor was in her previous foster care placement with more children, it was "more stress" for Minor. When Minor was moved to live with A.P., he could see that Minor was "more relaxed." Father testified that while Minor had previously told Father that she wanted to be with him, Minor "ha[d] not expressed that anymore" since living with A.P. He noticed that Minor was "more distant," was "a little bit disinterested" in their conversations and had occasionally asked to end the visits early.

After the testimony, counsel for Father argued that the parental-benefit exception applied. Counsel argued that there were many times where Minor had struggled, and that it would benefit her if Father was there "to encourage her to do better, to stay in school, and to let her know that there are people that love her even if she doesn't know them."

The juvenile court determined that the parental-benefit exception was not applicable. It stated: "[W]hile the benefits of visitation might be there, the beneficial relationship exception does not apply. [¶] Even though both parents have maintained regular visitation and contact with [Minor], the child – they have to occupy a role that the child would suffer a detriment if the parental relationship is terminated, and that is not going to be the case here. [Minor] will not suffer detriment with the termination of the relationship. [¶] It is in her best interest to enter into a permanent adoptive relationship with her current caregiver. [¶] And to overcome this preference for adoption and avoid termination of the natural parents' right, the parent must show that severing the natural parent-child relationship would deprive

6

the child of a substantial positive emotional attachment such that the child would be greatly harmed, and that has not been shown." The court also noted: "And in reaching this decision I have to look at all of the facts and circumstances which will include the age of the child, the portion of the child's life spent in the parents' custody, the positive or negative effect of interaction between parent and child, and the child's particular needs."

The court then explained that it was taking "special note of [Minor's] particular need for stability and continuity and lack of chaos, where she seems to be thriving right now in her placement." Minor's issues seemed to be "resolving" because of the one-on-one attention from A.P. and the close connection to her half-sisters. The court continued: "And while I cannot consider – and I have to think that from this moment, this ruling, that there's the possibility if – I have to make my ruling based on that, I am hoping, based on how much you've grown – and [Father], I hope your visits continue as well virtually and supervised – I hope that in the consortium that something can be worked out so that you continue to remain and will grow as a positive influence in [Minor's] life."

The court terminated the parental rights of both Minor's mother and Father,[3] and found Minor adoptable. The court noted it had read and considered *Caden C.*, and "all of the implications of that case," but still believed that termination of parental rights was in Minor's best interest. This appeal followed.

## DISCUSSION

The issue raised in this appeal is whether the juvenile court committed reversible error in determining that the parental-benefit exception did not apply. As the California Supreme Court recently explained in *Caden C.*, the

---

[3] Minor's mother is not a party to this appeal.

7

goal of a section 366.26 hearing is to select and implement a permanent plan for the child. (*Caden C., supra*, 11 Cal.5th at p. 630.) It is not an opportunity for the parent to resume custody of the child, as reunification services have already been terminated and "the assumption is that the problems that led to the court taking jurisdiction have not been resolved." (*Ibid.*) A parent may, however, avoid termination of parental rights by establishing the three elements required for the parental-benefit exception: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Id.* at p. 631.) "While application of the beneficial parental relationship exception rests on a variety of factual determinations properly reviewed for substantial evidence, the ultimate decision that termination would be harmful is subject to review for abuse of discretion." (*Id.* at p. 630.)

Here, Father does not challenge the juvenile court's determination on the first element of the parental-benefit exception. Indeed, it is undisputed that there was substantial evidence showing Father had regular visitation and contact with Minor. Instead, Father relies primarily on *Caden C.* to argue that the court did not conduct a "full analysis" and considered "improper factors" on the remaining two elements.

Before turning to the merits, we reject Respondent's contention that Father forfeited these arguments by failing to object or ask for clarification as the juvenile court was making its ruling. Respondent cites *In re A.K.* (2017) 12 Cal.App.5th 492, but that case found forfeiture of an issue the father never raised in the juvenile court—the social worker's alleged failure to satisfy statutory requirements in pursuing the paternal grandmother as a relative placement. (*Id.* at pp. 500–501.) Here, the issue Father raises on appeal is

the same one that was before the juvenile court: the applicability of the parental-benefit exception. After his unsuccessful effort to persuade the court that the exception applied, Father was not required to articulate the ways he believed the court had just erred in order to preserve his right to appeal.

We now turn to Father's arguments regarding the second and third elements of the parental-benefit exception.

### 1. *Benefit from Continuing the Relationship*

To establish the second element of the parental-benefit exception, "the parent must show that the child has a substantial, positive, emotional attachment to the parent – the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C., supra*, 11 Cal.5th at p. 636.) The inquiry is focused on the child, and thus courts "often consider how children feel about, interact with, look to, or talk about their parents" when considering whether they would benefit from continuing the relationship with their parent. (*Id.* at p. 632.) Courts may also consider "a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Ibid.*)

The juvenile court did not markedly distinguish the second element from the third in its analysis, so it is ambiguous whether it made a separate finding on this element and, if so, what it was. While the court observed that "the benefits of visitation might be there," it also stated that Father failed to show that termination of parental rights "would deprive the child of a substantial positive emotional attachment such that the child would be greatly harmed." The parties' briefing construes the ruling to include a finding against Father on the second element, and because ambiguities must be resolved in favor of affirmance, we will adopt that construction. (See *In re*

9

*Eli B.* (2022) 73 Cal.App.5th 1061, 1069.) But in doing so, we do not mean to imply that a distinct finding on the second element is necessarily essential. (See *In re A.L.* (2022) 73 Cal.App.5th 1131, 1156 [father failed to identify authority establishing that a court must "recite specific findings relative to its conclusions regarding any or all of the three elements of the exception"].) And in this case, our conclusion below that the court did not abuse its discretion in applying the third element would not be different if we construed its ruling to include a finding in Father's favor on the second.

Father argues that the juvenile court's treatment of the second element considered a factor—his failure to occupy a "parental role"—deemed improper by *Caden C.* But the juvenile court did not use the phrase "parental role," and the record does not otherwise support this contention. In *Caden C.*, the Supreme Court explained that the parental-benefit exception focuses on the relationship between the parent and child, not the parent's attributes as a custodial caregiver versus the potential adoptive parent, or whether the parent can provide a home for the child. (*Id.* at p. 634.) There is nothing in the record to suggest that the court improperly shifted that focus here. Instead, it simply explained that a parent has to "occupy a role that the child would suffer a detriment if the parental relationship is terminated, and that is not going to be the case here." In context, the court was referring to the nature of the relationship between Father and Minor; the court's use of the word "role" by itself does not indicate that it was considering Father's attributes as a custodial caregiver or his ability to provide a home for Minor.

Father cites several other cases in support of his argument, but the claims of error in those cases did not rest on the juvenile court's single use of a particular word or phrase; they presented additional evidence to indicate the challenged decision may have been based on factors disapproved of in

10

*Caden C.* Moreover, all but one of the cases applied *Caden C.* to juvenile court decisions rendered before its issuance, whereas here the juvenile court had the benefit of the Supreme Court's decision and expressly referenced it.

*In re B.D.* (2021) 66 Cal.App.5th 1218 reversed an order terminating parental rights because the juvenile court repeatedly referenced whether the parents occupied a "parental role" or whether a "parental relationship" existed, and that the paternal grandmother had been providing for the children's daily needs. (*Id.* at p. 1230.) These references were "concerning" in context because the social worker had equated a "parental role" with the ability to parent on a fulltime basis and with a parent maintaining sobriety, and it was not clear the juvenile court had evaluated whether the parents nonetheless had a substantial, positive, emotional attachment with the children. (*Ibid.*)

*In re J.D.* (2021) 70 Cal.App.5th 833 reversed an order terminating parental rights where closing arguments by the parties' counsel alluded to the kinds of factors that would be inappropriate under *Caden C.*, such as the mother's inability to succeed in overcoming her parenting struggles and the suitability of J.D.'s current placement, and failed to address whether J.D. had an emotional attachment to the mother. (*Id.* at pp. 863–864.) In that context, the juvenile court's finding on the second element "was conclusory and thus problematic—that mother's relationship with J.D. did not 'amount to a parental bond.' " (*Id.* at p. 864.)

Similarly, *In re D.M.* (2021) 71 Cal.App.5th 261 reversed an order terminating parental rights because the juvenile court "focus[ed] on whether [the] father occupied a 'parental role' in the children's lives, equating that role with attendance at medical appointments, and understanding their

medical needs," but "said nothing about the attachment between the father and his children." (*Id.* at p. 270.)

Finally, *In re L.A.-O.* (2021) 73 Cal.App.5th 197 reversed an order terminating parental rights because the juvenile court rejected the parental-benefit exception on the grounds that "the parents 'ha[d] not acted in a parental role in a long time' " and "the prospective adoptive parents 'ha[d] been acting in a parental role.' " (*Id.* at p. 202.) It was thus unclear whether "parental role" was used to mean that the parents "were not capable of taking custody, or had not been good parents, or had not been providing necessary parental care," which would be an erroneous consideration under *Caden C.* (*In re L.A.-O.,* at p. 212.)

Here, unlike the cases described above, there is no evidence that the juvenile court considered Father's lack of *parental* role, and more importantly, there is no evidence that the court relied on any consideration of "parental role" in lieu of examining the attachment and quality of bond between Father and Minor as outlined in *Caden C.* On the contrary, the record reflects that the court did examine that issue, and we conclude that substantial evidence supports its conclusion.

By all reports, Minor was thriving with the stability and continuity of her current placement, and her behavioral and school challenges were resolving. Minor had not lived with Father for several years, and Minor had expressed that she wanted to move forward with her adoption by A.P. Indeed, Father himself testified that Minor was "more distant," "a little bit disinterested," and had occasionally asked to end their phone visitations early. Thus, notwithstanding the court's observation that "the benefits of visitation might be there," substantial evidence supports a conclusion that the relationship did not have qualities sufficient to satisfy the second

12

element.  (See *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 [the second factor requires "a significant, positive, emotional attachment from child to parent" and not just an "incidental benefit"].)

### 2. *Detriment to Child*

The third element of the parental-benefit exception requires the parent to show that termination of the relationship "would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.)  Here, Father argues that the juvenile court's analysis on this element was incorrect because it considered improper factors and thereby gave "insufficient consideration" to the harm Minor would suffer from termination of her relationship with Father.

As an initial matter, our conclusion that substantial evidence supports a determination that Father failed to carry his burden on the second element makes it unnecessary to consider the third.  (See *In re A.G.* (2020) 58 Cal.App.5th 973, 995 ["In assessing the third component, assuming the parent establishes the existence of a beneficial parent-child relationship, the juvenile court must then determine whether the relationship 'constitutes a "compelling" reason to forgo termination of parental rights' "].)  However, because the juvenile court considered the second and third elements together, we consider but ultimately reject Father's arguments.

First, he contends the court improperly compared caregiver attributes of Minor's mother and A.P.  This argument is belied by the record.  The juvenile court stated:  "And even though [Minor] has spent a great deal of time in the mother's custody, her presentation right now when she's in this one-on-one connection with the foster parent, [A.P.], convinces me that this is in her best interest, that the beneficial relationship exception does not apply and she would not suffer a detriment by terminating the parental

relationship." This was not a comparison of caregiver attributes, but instead a proper balancing of the harm from Minor's loss of parental relationships with the benefit of Minor's prospective adoptive placement. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

Second, Father contends that the juvenile court "appears to have erroneously assumed that finding the exception applicable would mean that [Minor] would be removed from her current caregiver." There is nothing in the record to support this contention. As explained above, Minor's status in her placement with A.P. was an appropriate consideration in weighing the potential harms of parental relationship termination and benefits of adoption. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

Third, Father argues that there was "ambiguity as to whether the court improperly relied on the caregiver's willingness to include the father in [Minor's] life" that affected its consideration of whether Minor would suffer harm from the termination of the parental relationship. As the termination of parental rights "eliminates any legal basis for the parent or child to maintain the relationship," the court "must assume that terminating parental rights terminates the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) It cannot terminate parental rights "based upon an unenforceable expectation that the prospective adoptive parents will voluntarily permit future contact between the child and a biological parent, even if substantial evidence supports that expectation." (*In re C.B.* (2010) 190 Cal.App.4th 102, 128.) The record here, however, does not support Father's assertion that the termination of his rights may have been based on A.P.'s openness to post-adoption contact with the parents. On the contrary, the juvenile court acknowledged that it "cannot consider" the possibility of future interactions

between Father and Minor in its ruling, even if the court was "hoping" that the visits would continue.

In sum, we see no basis to conclude that the juvenile court's analysis of the parental-benefit exception relied on improper factors.[4] We thus conclude that the court did not abuse its discretion in determining that Father had not met his burden to establish that the exception applied here.

## DISPOSITION

The August 19, 2021 order terminating Father's parental rights is affirmed.

GOLDMAN, J.

WE CONCUR:

POLLAK, P. J.
STREETER, J.

---

[4] We thus need not address Father's additional argument that the incorrect analysis of the parental-benefit exception was prejudicial.